Good morning and welcome to the Ninth Circuit. I'm Judge Nelson and joined by my colleague from the Ninth Circuit, Judge Wallace. Judge Wallace and I would like to welcome Judge Gwynne who came back for a second day to sit with us from the Northern District of Ohio and we want to thank him again for his willingness to help us out with our calendars. We'd like to welcome counsel who will be arguing virtually today via video conference. I know we all would like to be in San Francisco and we hope that relatively soon in the near future we'll be able to but we are grateful for everybody's accommodation in these circumstances. We ask that during arguments you please watch your time, keep to the allocating time frames and try to sum up before the time expires. Let us know if you would like to reserve time for argument or rebuttal. We're ready to proceed with the calendar. First of all, we have three cases. Our first three cases that were scheduled for today have been submitted on the briefs. Those are Roxanna Henrique-Mong versus William Barr, case number 14-72303. Rosanna Geronimo-Matias versus William Barr, case number 17-71716 and 18-70289 has also been submitted on the briefs. And finally, Maria Magdalena Ramos-Portillo versus William Barr, case number 18-73274 has also been submitted on the briefs. We'll hear argument in three cases today. The first of those is United States of America versus David Laig and that is case number 18-10500. This case is set for 15 minutes per side and counsel, you may proceed when you're ready. Thank you. Good morning, your honors and may it please the court. Leah Spiro for David Laig. I'd like to reserve three minutes for rebuttal and I'll watch the clock. The guilt of a defendant must be based on the charged conduct, not on what else he has done. Mr. Laig's trial violated this basic principle. Mr. Laig was overprescribing to five patients based on 39 specific prescriptions. And his expert at trial said that those prescriptions were medically justified. But the trial became a judgment on his overall prescription rate to his entire practice of over 450 patients and his treatment of three patients who died of uncharged overdose deaths. Counsel, I understand your arguments as to the additional data that was brought in, but the government did present evidence. You mentioned the defendant's expert addressed the 39 prescriptions for the five patients, but the government also presented evidence on those specific prescriptions as well, didn't they? That's correct. Good. So what the trial came down to was dueling experts who were equally trained, equally qualified. One expert saying that the prescriptions were medically justified, the government's experts saying that they weren't medically justified. And of course, the government had to prove beyond a reasonable doubt that they were not medically justified and that Mr. Laig knew and intended that they were not medically justified. So in order to get to beyond a reasonable doubt, the jury would have had to discredit Mr. Laig's highly trained expert. And the way it got there is because of this other act evidence that came in that tipped the balance for the government. And that evidence, there were two forms that were particularly prejudicial. One was the data that was practice wide, that the government purported to use to show Mr. Laig's intent, but didn't end up arguing it that way at trial. And then the evidence of the three uncharged overdose deaths. So I'll start with the data. The government moved in Lemonade to bring the data in to show Mr. Laig's purported intent to unlawfully overprescribe. But the problem for the government is that its own data experts both said they could not draw an inference from the data about the propriety or the impropriety of the prescriptions contained in the data set. And the government's medical expert did not take a look at the data or opine on the propriety of the prescriptions contained in the data set. So there was simply no evidence in the record for the jury to draw an inference. First, that any of the prescriptions in the data set were unlawful. And second of all, that Mr. Laig intended them to be unlawful. Counselor, can I ask a question just out of the background here? As I understand the record, defense counsel below objected to admission of this evidence under Rule 404, but did not object to this evidence as admissible under Rule 403. Is it your position that we would review 404 for an abuse of discretion, but 403 for plain error? Or are you arguing that an objection based on 404 necessarily includes an objection under 403 as well? We're arguing the latter point that it's it's baked into the 404-B analysis. And the court said in Mayans that 403 is an essential part of 404. But we don't need to win on that. So even if the court... You don't need to win. The point is one that bothered me too. When you say you don't need to win, are you indicating to us that you would prefer we not go ahead with that? And you're giving in on that point? I'm saying that even if you use plain error for the 403 piece, we still win. So even though we're saying it should be reviewed for abuse of discretion for both 404-B that encompasses 403, if you break it down and you use two different standards of review, this claim still shows reversible error. And here's why. First of all, one thing to note on standards of review, whether the evidence actually served the intended 404-B purpose is reviewed de novo. So I want to make that point. So whether this actually... In this case, the trial judge seemed to have relied upon some... Was intent contested? And when the trial judge referred to the 404 evidence that show intent. Intent to do what, I guess, is the immediate question. Because your client didn't deny that he had prescribed to these five charged cases, right? That's correct. And he didn't contest that he had prescribed particular amounts to each of them, did he? He did not. So was it an intent to prescribe outside the usual norms within the practice of medicine? Is that the intent they were offering this evidence arguably for? That was the proffered intent. And so the government, to get to that intent, the government had to establish that the data actually showed that the prescriptions contained in the data were unlawful and that Mr. LeGue intended them to be unlawful. And it's very notable that the government didn't end up using the data at trial for intent. So if you look at the government's closing argument, where, of course, they're arguing to the jury how to use the facts that came out at trial, the government argued intent based on three different buckets of evidence that were specific to the charges that didn't include the data. So the government argued that LeGue's own statements to investigators, his statements to confidential informants, and to the grand jury all showed his intent. The red flags that he supposedly overlooked in his treatment of these five particular named patients reflected intent and the alleged falsification of the records for these five patients. The way the government... You know, I suppose the trial judge told the jury, don't pay any attention to the lawyers, rely on your own understanding. I'm not sure there's a waiver here, if that's what you're attempting to argue. No, our primary argument is the government never introduced foundational facts to show how you get from this data to an unlawful intent to over-prescribe. On 404B? Well, if you're going on 404B, clearly it's a rule of inclusion, not a rule of exclusion. Don't you have an uphill battle with that one? In our circuit, we have a very low threshold test. Well, it's a rule of inclusion once you show that a valid 404B purpose is served. And on appellate review, the court looks to the entire record to see if the government set those foundational facts. And two cases that are helpful in this regard are United States v. Jones and United States v. Merrill. Those are the eighth and the eleventh circuit cases that have addressed the use of practice-wide prescription data. And they are consistent in their approach. And they set out two different scenarios, one where the government hasn't put on sufficient evidence to show that the data can come in for a valid purpose, and one where the government has. And the analysis is both 404B and 403. So in Jones, the government simply brought in data without any testimony data reflecting an unlawful intent. And the eighth circuit said that data came in improperly because there was no valid evidence from which the jury could draw an inference of unlawful intent. And the government didn't need it because there were just individual charges. There wasn't a practice-wide scheme alleged. And that is what differentiates these two cases, both Jones and our case, from Merrill, which is where the government alleged a practice-wide fraud scheme. And it brought in several experts who looked at the data set and said, here are the aspects in this data set that give rise to a reasonable inference that the doctor was over-prescribing and that he knew it. And those — And let me just suggest that you might leave some time for us to ask questions. Yes. In this case, though, isn't there almost a better 403 argument? And what I'm admitting is that he had been over-prescribing when compared to other physicians. I mean, Lake himself, in the interview with the FBI, basically admitted that. So isn't, in some ways, a better argument that the universe of data wasn't necessary to establish intent that Lake has already admitted an intent to prescribe some ways beyond that standard? I disagree with why it wasn't relevant. I think it wasn't relevant because the government already had evidence of Mr. LeGue's intent. And you're right, based on the admissions he had made. But I don't think those admissions actually established that Mr. LeGue knew he was over-prescribing at the relevant time. I think what they showed is that, at some point, in retrospect, he realized that he was an outlier prescriber and that he should have been taking a more conservative approach. But that certainly doesn't mean that — Well, he testified — didn't he testify that a lot of the pharmacies had come to him and questioned his prescriptions and the volume of them and the quantities of them? Yes, that's correct. And didn't he admit to the FBI agent that, I knew we were prescribing a large amount of pills? That's correct. He did admit that. And I think that fits within a band of what practitioners can decide to do. They can take an aggressive approach or they can take a more conservative approach. So his admissions, certainly the government could ask the jury to find unlawful intent based on those. But they're not conclusive to unlawful intent because, as his expert testified, these were medically justified prescriptions based on the symptoms that his patients were presenting. So he still — The government argues that you opened the door relative to the evidence of his client's death. Did the trial counsel open the door on this by cross-examining the government's expert about the charged client — or the charged cases not involving death as that the government's expert described as likely or possible? Counsel didn't open the door to this because he elicited 100 percent accurate responses that two of the named patients did not die despite what government's expert had categorized as lethal amounts of prescriptions. And there was no inaccuracy. There was no misleading partial answer there. And the permitted response always has to address the particular misrepresentation. Here there wasn't a misrepresentation. But certainly bringing in evidence that three patients had died did not cure anything that was — any statement that was made by that expert. Did the defense attorney ever suggest that death was not a possibility with the quantities of drugs he was prescribing? He did not. He did not make that suggestion, nor did he elicit that suggestion from the government's expert. He simply pointed out that the amount of medication was classified as lethal by the government's expert, but the two of the named patients did not die. That was the end of that testimonial inquiry. So that didn't open the door. And I'll just say in closing that the evidence that three patients died of these uncharged overdoses is extremely prejudicial. It's hard to imagine more prejudicial information. And the government got the benefit of having that innuendo that Mr. LeGault caused these deaths without actually proving that the medication caused it and it was foreseeable. So I'll reserve the remainder of my time unless the court has more questions. Mr. Halpern, you may proceed. Good morning, your honors. May it please the court. Josh Halpern for the United States. The defendant, David LeGault, was convicted on 39 counts of distributing pills to four patients and a confidential informant. The evidence of trial that he acted outside the usual course of medical practice came in several different forms. There were recordings from an undercover DEA investigation that showed the defendant facilitating illegal drug transactions, scheming about how to avoid detection, and repeatedly falsifying patient records to cover it up. And the medical files for the patients named in the indictment showed that he prescribed more than 50 times the CDC ceiling dose to both an OxyContin addict and a repeat heroin user. Why'd you offer them the the practice-wide evidence? If you had such strong evidence on his individual prescriptions to the to the counts of the indictment, why get into the whole practice itself if you had such strong evidence? Because in this context, your honor, the standard of liability bakes into it the norm of the medical community. And so the defendant's deviation from the median in cases like this one is particularly probative. Well, you didn't have evidence from his own admission that he understood that he was prescribing outside the norms and received calls from both family members and pharmacies. And I believe workers' compensation as well. Inquiring why are you prescribing at these levels? We did, your honor, and he conceded in his grand jury testimony that the practice was over-prescribing and attracting drug addicts. But why do you muddy the whole water by bringing in all this extraneous evidence about uncharged? At most, your honor, it creates a problem of cumulative evidence, and that would be a distinct 403 concern. The defendant did not raise below and does not renew on appeal. The brief is chiefly addressed to the 404B threshold question. And so... On the death evidence, why didn't you charge those? You picked a number of patients to charge him on. Why wouldn't you have charged him on the death of these three individuals that you thought you had strong evidence related to his over-prescription? I didn't litigate this case, your honor, so I can't speak to the decisional calculus behind the government's charging decisions, but I can tell you why that overdose death was plainly admissible under 404B. Okay, how's it admissible under 404? To show what? Sure, it goes to the defendant's knowledge that prescribing in these amounts and combinations raised a considerable risk of overdose death, even for patients who had developed tolerance. Well, anybody in this field, anybody that's followed news generally appreciates that opioid over-prescription can cause death. I mean, it's in the news daily. That's right, your honor. Did he ever deny that it potentially could cause death? He didn't flatly deny that it could cause death, but his theory of the case was that these patients in particular had developed a high tolerance, and that a doctor needs to make, or a physician's assistant needs to make an individualized calculation with respect to each patient, and that on the basis of his own personal prescribing experience, he could firmly conclude that the risk of overdose death was low. Now, we know for a fact that that wasn't true because he had engaged in a similar course of conduct, and his patients had died as a result, and so this Can I, I thought, I thought the defendant, but maybe it wasn't the defendant, maybe it coming and came in another way, suggested that he wasn't aware of any of his patients that had actually overdosed. Am I, am I wrong about that? The record makes clear, your honor, that defendants knew that at least one of the patients certainly died roughly in 2012. If you look at excerpts of records 1550 to 1551, the defendant acknowledged that patient Kimberly Scobie died of a combination of drugs at several times the high ceiling dose. He said he knew she died from the drugs in 2012 because her father reported and told him so, and because the DEA had conducted an investigation. Didn't, didn't he, didn't he also testify that he knew that 10 of his patients had died? He wasn't sure of the cause of their individual deaths, but he knew at least 10 had died within, during his course of treatment. I think, I think your honor's correct that he offered general testimony to that effect when the government broke him about how many of his patients had died. He said he wasn't sure about exact numbers, but the particular cross-examination that the defendant claims constitutes plain error here only concerned three patients, and in, with respect to that testimony, it's very clear from excerpts of record 1350 to 1551, the defendant nearly conceded that he knew about one, and he said he had a policy of following up, and that he had learned about another one of the deaths from that policy, and all we had to prove was that a reasonable jury could conclude that the defendant knew. What, what, what was the, what was the relationship of the, the, the death's time relationship to the, to the charges in the indictment? Were they before, significantly before? I believe that one was a few years before Scobie, and the other two were roughly contemporaneous. I haven't mapped out the exact timeline. The indictment spans from, I believe, the end of 2014 to 2016, and I'll, I'll have to refresh my recollection by looking at the, uh, the record on the other two deaths, but I do believe they were, they were roughly in that vicinity. But what did, uh, when you say he acknowledged, uh, some knowledge of death, was that after the or before the government brought this evidence in? Because I had the impression, and now I'm, I'm trying to make sure that it's correct, that there was some testimony that he said he'd never been aware of any deaths, and that's what prompted the government to bring this in, and after that, then he started to acknowledge that he actually was aware of some deaths with some, you know, caveats. But, so I'm just trying to make sure I understand the, the timing there and how it came up at trial. So our, so his expert questioned, sorry, his lawyer questioned our expert and, and implied that these, these risks of overdose are individualized to the patient, and each prescriber needs to make an individualized determination. The next day, well, that evening, we apprised the other side, and we were going to present evidence about deaths, specific deaths, to show that the defendant, in fact, knew the risks he was running with these patients, and so then when the defendant testified, we cross-examined him about three specific overdose deaths. In his testimony, he conceded that he knew about two of the deaths, he knew the cause of one of the deaths, he purported not to know the cause of the other, or to be aware of the third, but of course, his denials don't affect whether we satisfied our burden under 404B, and the jury had ample reason to disbelieve him. So just so I'm clear, this was not in, this was not offered for impeachment testimony or anything like that. The evidence, the suggestion, but I didn't understand from your statement just now, that the, that the Defense Council had actually suggested LeGault was not aware of any deaths. So I'm trying to figure out what made the government jump to present evidence of deaths. That didn't seem to be an issue. It was, the deaths served a very discreet 404B purpose, which was to refute defendant's contention that he believed, with respect to these patients, based on his own prescribing history, that the risk of overdose was low because they had a demonstrated tolerance. So no, it wasn't to rebut any generalized allegations that he didn't know about deaths in general. It was really to serve this discreet purpose. Well, wasn't the testimony from both experts to the impact that the use of opioids is risky, but the exact quantity of opioids that would cause death varies patient to patient? Yes, Your Honor, that is true. And so if these three people died, how instructive is it, if they died at lower levels or higher conduct, that he prescribed particular amounts to other people? I mean, if you had had evidence that everybody prescribed a particular level to die, that might give you better evidence as to intend. But just kind of three people died at respectively different levels of prescription. Therefore, he should know that as to a fourth or fifth or sixth patient, that differing amounts of prescription potentially caused a risk. So they did, like the patients charged, for whom the prescriptions were charged, in this case, they received high amounts and dangerous combinations. So I think Your Honor's question goes to the force of a rebuttal, but not to its fundamental admissibility at the 404B threshold. But even if you disagree with us on the threshold, the overdose death argument still fails both the third and fourth prongs of plain error. It fails the prejudice prong because the relevant questions span just 16 pages of cross-examination in a two-week trial. It was followed by a lengthy limiting instruction. It wasn't part of our case in chief. We didn't bring it up in our submission, and it was vastly overshadowed by other evidence of guilt. Let me ask you, because you've got a bit of time, but let me switch you to 608. So his expert gets on the stand, and you then cross-examine him about his own prescription levels. And then you bring the expert on from the DEA to give testimony in comparisons between the expert's prescription levels and the defendant's. Under Rule 608, isn't that extrinsic evidence of specific instances of a witness's conduct to attack the truthfulness of the testimony? No, Your Honor. As we explained in our brief, Rule 608 prohibits impeaching experts based on prior acts only if that evidence is introduced solely to question the expert's character for truthfulness. Here, they were— Well, in this case, you were challenging his truthfulness character. He's given testimony that certain levels of prescription may have been medically appropriate. The way you then attack that truthfulness of that opinion testimony is by showing that he himself had prescribed different levels. Your Honor, that does implicate the expert's conduct, but it's not attacking his versions of his character for truthfulness. It goes to the old lines— Well, isn't it exactly? You're saying he lied when he gave opinion testimony that the range of prescriptions was within norms. Your Honor, every substantive response to an expert's communicates that the expert is incorrect. If you're incorrect, I guess in a sense you're telling an untruth, but it's not because you have bad character. It's because you're substantively wrong. The contrast between the defendant's expert and the defendant showed that the defendant engaged in an intentional pattern of over-prescribing in the same way that the aggregate data showed that point. It rebutted the defendant's expert's specific claim that the defendant may have believed that these extra high doses and these exceptional patients. The stark contrast increased the likelihood that the defendant's intentionally indulged still-seekers rather than accommodating exceptional cases in the same way the defendant's position in the overall median of prescribers made that same point. Well, in the trial of this case, did you offer all the— did trial counsel offer the DEA standards or the Medicaid standards for prescription levels? Medicare and pain management anesthesiologists, were those standards all offered in the trial? Your Honor, we put on extensive evidence about guiding standards for pain management. Why would you need to bring in all the evidence regarding his comparison to everybody else? Because, Your Honor, his essential theory was that these patients were exceptional and that he believed that, and his place in the median with respect to other prescribers makes it exceedingly unlikely that all of his patients across his entire practice— Yeah, but, I mean, it was kind of a baloney defense, wasn't it? He says he gave high prescriptions because some woman had three or four children in her house. If Your Honor believes that the defense is baloney, that only underscores the harmlessness of any error in this case. And that refers me to one final point I'd like to make in the time I have left, which is that the evidence of guilt with respect to each patient in this case was truly legion. But the defendant's chief contention of why there can't be harmless error is that his expert testified and that he testified in his own defense. But as we say in our brief, that testimony ignored the most damaging evidence against him, and it relied on statements that the jury knew to be false. The defendant was falsifying medical records, equivocating about his own truthfulness, and his patients were demonstrated drug addicts. The defendant says we're asking you to construe the evidence in our favor, but that is not correct. Harmless error requires a practical judgment about whether any error actually affected the trial. Where a defendant puts on a case and testifies, you can't run that inquiry without gauging the credibility and strength of his case. And if you look at the entire record, it will make abundantly clear that his case was puny. The defendant's contrary position would allow a drop of self-serving testimony to short-circuit the prejudice analysis. So in addition to the fact that we believe on the merits of every pain, any error in this case was surely harmless. But if I could turn your Honor's attention to the two charges related to the confidential informant, to the extent your Honors do have concerns about the aggregate data, you can rest assured that it had no impact upon at least, at the very least, those two counts. For those, the jury based its conviction on recordings in which the CI asked the defendant to double his opioid scripts so that he could sell half. If there are no further questions, we'd ask that your Honors speak first. Thank you. Your Honors, just a few quick points in rebuttal. The government just ended on a point that I want to make sure you know. The District Court found that to the extent these errors are found to have been committed, the District Court agrees that the prejudice flows equally to all counts, including the two counts against the confidential informant. And I can submit the Court's order to the Court because it's not currently in the excerpts of record, but the District Court already resolved that issue. Here, the government chose what to charge. It had abundant evidence to prove those charges, and it was unnecessary to bring in this inflammatory and unsubstantiated evidence about Mr. LeGue causing at least three patient deaths and overprescribing across the board. It's unquestionable that this affected the jury's decision making. So we ask that you reverse and remand for retry. Thank you, Counsel, both of you for your arguments in this case and the case is now submitted.
judges: Wallace, R. Nelson, Gwin